In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3298

ELLIOT VELEZ and ALFONSO ORTIZ,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, a municipal corporation,

*Defendant-Appellee.*

Appeal from the United States District Court
for the North District of Illinois, Eastern Division.
No. 03 C 4437—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED JANUARY 20, 2006—DECIDED APRIL 4, 2006

Before FLAUM, *Chief Judge*, and BAUER and RIPPLE, *Circuit Judges*.

FLAUM, *Chief Judge.* Plaintiffs-Appellants Elliot Velez ("Velez") and Alfonso Ortiz ("Ortiz") (collectively, "Plaintiffs") are both Hispanic Americans of Puerto Rican descent. Plaintiffs were employees of the Chicago Fire Department ("CFD"), working in the Community Services Division. Both held "exempt" positions, serving at the pleasure of the Fire Commissioner, who at the time was Edward Altman ("Altman"). At all times relevant to this appeal, Charles Burns ("Burns"), an African American, was Commander of the CFD's Public Education Unit, which included the

Community Services Division. Plaintiffs maintain that, beginning in 1997, Burns harassed them because of their Puerto Rican descent. Plaintiffs were demoted in June 1998. In Plaintiffs' view, Burns' discriminatory animus toward Puerto Ricans precipitated the demotions. Plaintiffs therefore filed suit against Burns and the City of Chicago ("City" or "Defendant"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Burns was subsequently dismissed from the suit. The City moved for summary judgment, and the district court granted the motion. Plaintiffs appeal. For the following reasons, we affirm the district court.

## I. Background

Elliot Velez, a Hispanic American of Puerto Rican descent, was hired by the CFD as a paramedic in 1982. By 1988, Velez held the career service rank of Paramedic Field Officer. "Career service" rank members of the CFD are firefighters and paramedics who have completed their probationary periods; they serve in a chain of command, in which higher-ranking officers can give orders to lower-ranking officers. In 1988, Velez was appointed to serve as the Coordinator of Community Services, an exempt position. "Exempt" rank members of the CFD serve at the pleasure of the Fire Commissioner and may be removed from exempt rank only by the Fire Commissioner.

Alfonso Ortiz, also a Hispanic American of Puerto Rican descent, was hired by the CFD as a firefighter in 1977. In 1988, he held the career service rank of firefighter. At that time, he was appointed to serve as Velez's assistant in the exempt position of Assistant Coordinator of Community Services.

In their exempt positions in the Community Services Division, Velez and Ortiz's primary responsibility was to serve as the CFD's liaison with the First Aid Care Team

program ("FACT program"). The FACT program maintains stations at Chicago Housing Authority ("CHA") housing developments to provide emergency medical services for residents and to offer emergency medical technician training to community members. The Hull House Association, a community service organization, contracts with the City to administer the FACT program. The FACT program has been under the chain of command of Deputy Fire Commissioner John Ormond ("Ormond") since 1997.

In December 1996, Charles Burns, an African American, was assigned to serve as Commander of the CFD's Public Education Unit, which includes the Community Services Division. Burns had some supervisory control over Plaintiffs, although they served at the pleasure of the Fire Commissioner and Burns was not authorized to remove them from their positions.

Plaintiffs allege that Burns began harassing them in 1997, by making derogatory comments to them and taking away their job responsibilities and privileges. For instance, Plaintiffs allege that on one occasion, Burns denied their request to buy a vehicle for the FACT program and said that he "didn't care how heavy your [profanity] Hispanic clout is, you can't do a [profanity] thing about it." Plaintiffs claim that on at least three other occasions, Burns stated, "God damn Puerto Ricans, they think they run this unit." Plaintiffs also allege that Burns prohibited them from speaking Spanish in the workplace, although it was necessary for them to interact with the Hispanic community. Additionally, Velez maintains that, on at least ten occasions, Burns accused him of drinking alcohol on the job. Velez also states that Burns accused him, in front of Velez's wife, of being intoxicated while on the job.

Moreover, Plaintiffs claim that Burns required them to perform menial tasks at the Public Education Unit, such as cleaning, grounds maintenance, and running personal errands. Plaintiffs maintain that Burns took away their

control over the FACT program. For instance, Plaintiffs claim they were "demoted" in March 1997, when Burns allegedly told all personnel in the Public Education Unit that Velez and Ortiz were no longer in the chain of command and should not be reported to. Ortiz also alleges that he was moved into a smaller office that did not contain a phone or other office equipment necessary to perform his job.

Velez alleges that he first reported Burns' behavior to the City in February 1997, by complaining to Chief Charles Stewart ("Stewart"), the CFD's Director of Personnel. According to Velez, Stewart told him to talk to the Fire Commissioner. Velez does not allege that he talked to the Fire Commissioner at this time. Velez claims that he complained about Burns again in May or June 1997, this time to Assistant Deputy Fire Commissioner Kenneth Wideman ("Wideman") and Ormond. Velez maintains that Wideman and Ormond were already aware of Burns' behavior, and that neither took any action in response to his complaint. Plaintiffs also allege that Ormond would not allow them to complain about Burns directly to the Fire Commissioner, but instead required them to follow department procedure and file a written complaint pursuant to the CFD's General Order 93-018. Plaintiffs did not make a complaint under the General Order.

Burns and the City maintain that Plaintiffs' job performance was unsatisfactory during the time period at issue. In a March 31, 1997, memo addressed to Tanja Ancrum ("Ancrum"), CFD's financial director, Burns criticized Velez's job performance. Burns noted, for example, that Velez did not attend FACT program meetings and ignored his job responsibilities. In February 1998, Ancrum notified Ormond by memo that Plaintiffs were neglecting their job responsibilities, for instance failing to complete expense reimbursement forms, submitting program budgets with

insufficient justification, and misspending FACT program funds. Based on Burns' and Ancrum's memos, Ormond drafted a memo to Fire Commissioner Altman, requesting that Velez be demoted to his career service rank. Soon after, Ormond requested that Ortiz be demoted as well.

Altman ordered Deputy Commissioner Kathryn Nelson ("Nelson") and Chief Philip Stelnicki ("Stelnicki") to review the allegations contained in Ormond's memo. Nelson and Stelnicki completed an investigation and concluded that Ormond's recommendations had a well-founded basis. On June 1, 1998, Altman returned Plaintiffs to their career service ranks and gave them new assignments. Velez is currently employed with the CFD as a Paramedic Field Officer. Ortiz retired from the CFD in 1999.

On June 16, 2003, Plaintiffs brought suit against Burns and the City, alleging hostile work environment and national origin discrimination claims under Title VII, 42 U.S.C. § 2000e *et seq.* On October 3, 2003, Burns was dismissed as a party defendant. The City moved for summary judgment on all claims. On July 6, 2005, the district court granted the City's motion. The district court found that Plaintiffs' hostile work environment claim failed because Plaintiffs did not establish that they were subject to harassment that a reasonable person would find hostile or abusive, nor did they establish that the CFD would be liable for the alleged harassment. As to Plaintiffs' national origin discrimination claim, the district court found that Plaintiffs offered no direct evidence that the City discriminated against Plaintiffs based on their national origin. The district court also found that Plaintiffs' claim failed under the indirect, burden-shifting method, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), because Plaintiffs did not show that they performed their jobs satisfactorily, that they were treated differently than similarly situated employees who were not of Puerto Rican

descent, or that CFD terminated them with no legitimate justification.

## II. Discussion

Plaintiffs maintain that the district court erred by dismissing their hostile work environment and national origin discrimination claims at the summary judgment stage. Our review of the district court's decision on a motion for summary judgment is de novo. *See, e.g.*, *In re Copper Antitrust Litigation*, 436 F.3d 782, 788 (7th Cir. 2006). Summary judgment is appropriate when, taking all of the pleadings and evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### A. Hostile work environment

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer is prohibited from requiring employees to work in a discriminatory hostile or abusive environment. *See Harris v. Forklift Systs., Inc.*, 510 U.S. 17, 21 (1993); *Shanoff v. Ill. Dept. of Human Servs.*, 258 F.3d 696, 701 (7th Cir. 2001). To survive summary judgment on a hostile work environment claim based on national origin, a plaintiff must establish that: "(1) he was subjected to unwelcome harassment, (2) the harassment was based on his [national origin], (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability."

*Beameon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005). We will discuss the fourth element first, because we find it to be dispositive in this case.

The district court found that Plaintiffs' hostile work environment claims failed because Plaintiffs did not prove any basis for CFD liability. An employer is liable for a hostile work environment claim if the plaintiff's supervisor created the hostile work environment, or if a co-worker created the hostile work environment and the employer was "negligent either in discovering or remedying the harassment." *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)) (internal quotation marks omitted).

Although Velez and Ortiz alleged that Burns was their "supervisor," that term has a specific meaning for purposes of Title VII. A supervisor is one with "the power to *directly* affect the terms and conditions of the plaintiff's employment," not simply one with "authority to oversee aspects of another employee's job performance." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). The district court found that Burns "did not have the final authority to hire, fire, demote, transfer, or discipline" Plaintiffs and therefore was not their supervisor. Instead, Altman made the final decision to return Plaintiffs to their career service ranks.

We agree with the district court that Plaintiffs have not shown that their "supervisor" created the hostile workplace environment. "Exempt" employees of the CFD, like Velez and Ortiz, are appointed by and serve under the Fire Commissioner. They report to the Fire Commissioner, rather than following the chain of command used in the career ranks. Altman was the Fire Commissioner at the time Plaintiffs were demoted, and he was the only one with power to demote Plaintiffs. Altman, not Burns, was Plain-

tiffs' supervisor at the time of the alleged incidents. Plaintiffs have not offered any evidence that Altman created a hostile work environment.

Additionally, we agree with the district court that Plaintiffs have not shown that the City was negligent in discovering or remedying Burns' harassment. Velez alleges that his first complaint about Burns was made to Stewart in February 1997. But Velez does not allege that he told Stewart about any specific harassment based on national origin. Velez notes that Stewart told him to talk to Altman, the Fire Commissioner. But he never alleges that he followed Stewart's advice and talked to Altman.

Plaintiffs allege to have made a second complaint about Burns, this time to Wideman and Ormond, in May or June 1997. But Plaintiffs do not assert that they told Wideman and Ormond about any specific harassment based on national origin. Instead, they allege to have complained about being required to perform menial tasks, forbidden from speaking Spanish, and taken out of the chain of command. Plaintiffs allege that they told Ormond that they wanted to take their complaints to Altman, but Ormond forbid this and ordered Plaintiffs instead to file a complaint pursuant to the CFD's General Order 93-018. The General Order requires that any complaints of discrimination and harassment be brought to the department's Assistant Director of Personnel. Plaintiffs did not make a complaint pursuant to the General Order, purportedly because Burns told them not to make any complaints. Burns' command did not, however, stop Plaintiffs from complaining to Wideman and Ormond, who told Plaintiffs to follow the General Order.

Taking the evidence as whole, we find that there is no question of material fact as to whether the City should be held liable for Burns' actions. There is no evidence that Plaintiffs ever complained of specific instances of national origin discrimination or harassment, or that the City

otherwise had knowledge of Burns' actions. Plaintiffs have offered evidence that they complained to supervisors about Burns harassing them, but a successful hostile work environment claim requires a plaintiff to demonstrate that the harassment was *based on* his or her protected status and that the employer was negligent in not discovering or remedying it. *See Beameon*, 411 F.3d at 863; *Mason*, 411 F.3d at 863.

We need not consider whether Plaintiffs were given conflicting orders about how to report Burns' behavior. There is no evidence that Stewart, Altman, or Ormond was aware of any harassment based on Plaintiffs' national origin, and thus we cannot draw the inference that these people gave Plaintiffs' conflicting advice to thwart their attempts to report Burns national-origin-based harassment.

The district court also found that Plaintiffs had not established any of the first three elements of the hostile work environment prima facie case: that they 1) suffered harassment, 2) based on national origin, 3) that was severe and pervasive enough to create a hostile and abusive working environment. *See Beameon*, 411 F.3d at 863. Plaintiffs argue that, in reaching this conclusion, the district court erred by failing to draw all reasonable inferences in their favor and ignoring certain specific allegations of harassment based on national origin. However, because our finding that there is no basis for employer liability disposes with Plaintiffs' hostile work environment claim, we choose not to address the remaining elements. *See, e.g.*, *Platinum Tech. v. Fed. Ins. Co.*, 282 F.3d 927, 934 (7th Cir. 2002); *Prairie Tank Southern, Inc. v. NLRB*, 710 F.2d 1262, 1265 (7th Cir. 1983).

## B.  National origin discrimination

A plaintiff can prove intentional employment discrimination either by offering direct evidence or through the

indirect, burden-shifting method enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Plaintiffs argue that they can prove discrimination under either method and that the district court erred in granting summary judgment for the City on their national origin discrimination claim. We consider the two methods in turn.

### 1. Direct method

Direct evidence of employment discrimination is that which shows an employer's intent, without relying on inference or presumption. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1290 n.6 (7th Cir. 1997) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F3d 343, 347 (7th Cir. 1997)). The district court found that there was no direct evidence that the City discriminated against plaintiffs based on their national origin. Burns never stated that he took actions against Plaintiffs based on their national origin; nor did any other CFD employees with supervisory control over Plaintiffs.

Plaintiffs contend that the following direct evidence establishes their claim: 1) Burns is an African American who expressed concerns over two Puerto Ricans running "an all-black program"; 2) Burns "showed an outrageous animus" towards Plaintiffs' national origin; and 3) Burns replaced Plaintiffs with an African American.

The district court did not consider Plaintiffs' first piece of evidence, which came from an affidavit submitted by Velez after being deposed, because both Plaintiffs stated in their depositions that they had not encountered any other incidents of discriminatory harassment other than those recounted on deposition. We agree with the district court's decision to exclude this evidence.

> [A] party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute

through the submission of an affidavit that contradicts prior deposition testimony. Consequently, "[w]here a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy."

*Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)) (second alteration in original). In this case, Velez has not explained the conflict between his deposition testimony and his later affidavit. The district court therefore properly excluded statements contained in the affidavit.

The other two pieces of direct evidence offered by Plaintiffs fail to show that the City discriminated against them based on their national origin. There is no evidence that Burns' derogatory statements about Plaintiffs' national origin motivated Altman to remove Plaintiffs from their exempt ranks. Additionally, the mere fact that Burns replaced plaintiffs with an African-American woman does not demonstrate that Burns or the City had any animus toward Plaintiffs because of their national origin.

#### 2. Indirect method

Under the indirect, burden-shifting method, Plaintiffs were required to show that: (1) they were members of a protected class; (2) they performed their jobs satisfactorily; (3) they suffered a materially adverse employment action; and (4) their employer treated similarly situated employees outside of the protected class more favorably. *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). If Plaintiffs established these elements, the burden would shift to the Defendant to "articulate a non-discriminatory justification

for the action." *Id.* In this case, the parties agree that Velez and Ortiz are members of a protected class and that they suffered an adverse employment action, but disagree as to the second and fourth elements of the prima facie case. Plaintiffs also maintain that the Defendant has failed to articulate a non-discriminatory reason for their demotion.

The district court found that Plaintiffs were unable to show that they had performed their jobs satisfactorily. As evidence, the district court pointed to Ancrum's memo to Ormond, which stated that Plaintiffs mishandled and misappropriated FACT program funds. The district court also looked to Nelson and Stelnicki's report, which confirmed that Velez and Ortiz misappropriated Hull House funds, failed to attend meetings, and did not perform required job functions.

Plaintiffs do not offer any evidence that their job performance was satisfactory at the time of their demotions. Instead, Plaintiffs maintain that the memos Altman based his demotion decision on were skewed by Burns' complaints about Plaintiffs—complaints that were motivated by Plaintiffs' national origin.

We agree with the district court's conclusion. Plaintiffs have not countered the reports of Ancrum and Nelson and Stelnicki, which stated that Plaintiffs were poorly managing FACT funds and neglecting their job duties. Ancrum's report was based on Burn's complaints about Plaintiffs' job performance, so there is a factual question whether Burns' animus infected Ancrum's report. However, any taint was removed when Nelson and Stelnicki, at the request of Altman, made an independent investigation into Plaintiffs' job performance and concluded that it was unsatisfactory and warranted demotion. Plaintiffs' failure to prove that their job performance was satisfactory dooms their national origin discrimination claim. Thus, we

need not address the remaining steps in the *McDonnell Douglas* analysis.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the order of the district court granting summary judgment for the City.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*