**NOT PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

No. 16-3872
_____

DOMINIC OGUEJIOFO,

Appellant

v.

BANK OF TOKYO MITSUBISHI UFJ LTD;
YAWER FADOO; PAVAN BORRA

On Appeal from the United States District Court
for the District of New Jersey
(District Court Civil Action No.:  2-14-cv-04513)
District Judge:  Honorable Madeline C. Arleo

Submitted Under Third Circuit L.A.R. 34.1(a)
July 13, 2017

Before:  GREENAWAY, JR., SHWARTZ, and RENDELL, <u>Circuit Judges</u>

(Opinion filed : July 31, 2017)

_____

O P I N I O N*

_____

**RENDELL**, <u>Circuit Judge</u>:

Dominic Oguejiofo, an African-American man born in Nigeria, brought suit against his former employer, Bank of Tokyo-Mitsubishi UFJ, LTD ("Bank"), and two of his former supervisors (collectively "Defendants"). Oguejiofo alleged discrimination on the basis of his race and national origin[1] in violation of Title VII of the Civil Rights Act 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, *et. seq.* ("NJLAD"). Defendants moved for summary judgment, and the District Court granted the motion in full. Oguejiofo appeals that ruling. Because Oguejiofo did not present any evidence that would permit a jury to conclude that the Defendants' conduct was linked to his race or national origin, we will affirm.

**I. Analysis**[2]

We review a District Court's grant of summary judgment *de novo*, applying the same standard as the District Court. *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016). We view evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmovant's favor. *Id.*

---

* This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.
[1] Oguejiofo does not distinguish between racial and national origin discrimination in his brief, nor did he do so in his initial complaint. Dkt. No. 1, p.1.
[2] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343 & 1367. We have jurisdiction under 28 U.S.C. § 1291.

*(A) Disparate Treatment Discrimination Claims*

Oguejiofo argues that a series of events that occurred while he was employed by the Bank were discriminatory: (1) his reassignment from being "IT Lead" on two projects to being a senior team member on those projects; (2) two negative performance reviews; and (3) his termination.[3]

Oguejiofo has presented circumstantial rather than direct evidence, and thus we use *McDonnell Douglas* burden-shifting to evaluate his claim. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).[4] The *McDonnell Douglas* framework operates as follows: first, the plaintiff must establish a *prima facie* case by showing by a preponderance of evidence that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action despite his qualifications; and (4) the action occurred under circumstances that raise an inference of discriminatory action. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

If a plaintiff establishes a *prima facie* case, the burden shifts back to the defendant to articulate a legitimate, non-discriminatory reason for its decision. *Id*. This burden is "relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory

---

[3] In the District Court, Oguejiofo also claimed that he received work assignments that were discriminatory, insofar as they were "excessive and required extensive hours at work and at home." A-46. He has not pressed that claim on appeal.

[4] We evaluate Oguejiofo's state law discrimination claims using the same *McDonnell Douglas* framework. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1087-88 (3d Cir. 1996); *Victor v. State*, 4 A.3d 126, 140–41 (N.J. 2010); *DeMoss v. Arc of Somerset Cty.*, 2015 WL 657106, at *4 (N.J. Super. Ct. App. Div. Feb. 17, 2015).

reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (internal quotation marks omitted).

If the employer meets the burden of articulating a non-discriminatory explanation for its action, the burden then shifts back to the plaintiff to present evidence from which a factfinder could infer that the proffered reason was pretextual. *Id.* To do so, a plaintiff must submit evidence which "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication" or would "allow[] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994); *see also Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1140 (N.J. 2005). With this in mind, we evaluate each of the Bank's allegedly discriminatory actions in turn.

(1) Reassignment

Oguejiofo claims that his reassignment from being IT Lead on two projects to being a senior team member on those projects constituted an "adverse employment action." The District Court found that this reassignment was not an adverse employment action for purposes of Oguejiofo's prima facie case.

We, too, are skeptical that the reassignment qualifies as sufficiently adverse to allow Oguejiofo's claim to proceed. To qualify as an adverse employment action in the discrimination context, an action must create "a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different

4

responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (emphasis added); *see also Storey v. Burns Int'l. Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (defining adverse employment action as "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment" (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001))). Here, Oguejiofo's reassignment did not affect his job title, benefits, or compensation.

Some cases have suggested that purely lateral transfers may qualify as adverse employment actions, especially when the nominally lateral transfer interferes with an employee's professional development or day-to-day working conditions. *See, e.g.*, *Jones*, 198 F.3d at 411–12; *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). But even those cases require that a nominally lateral transfer *significantly* impact a plaintiff's conditions of employment. *See*, *e.g.*, *O'Neal*, 392 F.3d at 911 (describing as adverse "a nominally lateral transfer" which "*significantly* reduces the employee's career prospects by preventing her from using her skills and experience" (emphasis added)).

Oguejiofo's claim misses the mark because he has not offered any evidence suggesting that the reassignment significantly altered his employment at the Bank. He has not pointed to any evidence suggesting that his skills were underutilized as a senior team member.[5] Nor has he explained how his professional advancement was hindered, or how

---

[5] Oguejiofo does make the conclusory statement that "reassignment away from the IT Lead Role on two major projects clearly prevents [him] from using his skills and experience." Appellant's Br. at 21. But he does so without citation or explanation.

his working conditions became less desirable as a result of the transfer.[6] In short, he has failed to demonstrate that the lateral transfer was sufficiently material so as to qualify as adverse for purposes of his *prima facie* case. While the reassignment might have been hurtful or disappointing, this without more does not "justify trundling out the heavy artillery of . . . antidiscrimination law." *Id.* at 913 (internal quotation marks omitted).

Even if the reassignment would qualify as an adverse employment action, Oguejiofo still has not demonstrated that the reassignment bore any relationship to his race or national origin, as is required to assert a *prima facie* case. Nowhere in his brief (or in the record) does he reference comments, actions, or circumstances indicating discriminatory intent. The only evidence Oguejiofo offers to support his claim is his own feeling that the Bank behaved in a discriminatory manner. Such subjective interpretations without more do not suffice to establish a *prima facie* case. *See, e.g.*, *Jones*, 198 F.3d at 414.[7]

---

[6] The Bank emphasizes that as IT Lead, Oguejiofo did not supervise any team members on the project. Instead, he supervised project deliverables. Thus, the reassignment away from being IT Lead did not actually change Oguejiofo's supervisory reporting structure.

[7] To the extent that Oguejiofo suggests the low number of African-American Vice Presidents at the Bank supports his claim, this bare assertion does not bolster his case. *See Ezold v. Wolf, Block, Schorr, and Solid-Cohen*, 983 F.2d 509, 542-43 (3d Cir. 1992) (noting that numerical comparisons, without any analysis of either the qualified applicant pool or flow of qualified candidates over a period of time are of limited, if any, probative value); *Daughtry v. Family Dollar Stores, Inc.*, 2011 WL 601270, at *7 (D.N.J. Feb. 16 2011) ("Where an employer has a facially neutral hiring policy, raw evidence of the number of minority employees compared to the number of nonminority employees alone fails to prove unlawful discrimination.").

Although Oguejiofo highlights a lack of diversity training at the Bank, the Bank in fact undertook a module on "inclusion diversity training" in June 2013. The Bank's response to Oguejiofo's desire for more diversity training may not have been as

And even if Oguejiofo had presented some evidence allowing an inference of discrimination, the Bank had legitimate, non-discriminatory reasons for the reassignment. Oguejiofo had missed a project deliverable as IT lead. His superiors had expressed frustration and concern over his performance in the role. One of Oguejiofo's team members on the project had emailed superiors that Oguejiofo lost his temper at team meetings in a manner that made "the meeting atmosphere strange." A-331. Oguejiofo does nothing to rebut this evidence as pretextual, and thus summary judgment was properly granted on this count.

### (2) Performance Reviews

Oguejiofo also alleges that two poor performance reviews preceding his termination were discriminatory.[8] But, as with his reassignment, he points to nothing suggesting the performance evaluations were tied to his race or national origin. He admits that no one at the Bank ever made disparaging remarks to him about his race or national origin. While Oguejiofo inferred discriminatory intent from his reviews, he directs us to no evidence allowing us to agree.[9] Further, Oguejiofo's own actions weaken his claim: after receiving the first of the two poor evaluations, Oguejiofo prepared a ten-page rebuttal for his superiors. Nowhere in his rebuttal did he mention discrimination.

---

immediate or as comprehensive as he preferred, but this does not support an inference of discrimination.

[8] The District Court ruled that a jury could have found that these performance reviews led to Oguejiofo's termination, and thus constituted adverse employment actions. We agree.

[9] We also note that only one of the poor performance reviews was prepared by Bank employees who, Oguejiofo alleges, had discriminatory animus. The other was prepared by a supervisor who Oguejiofo has *not* accused of acting in a discriminatory way.

Once again, even if Oguejiofo had shifted the burden to the Defendants, they offered legitimate, non-discriminatory reasons for the evaluations. First, as discussed, Oguejiofo's poor performance was well-documented by several employees at different levels of the reporting structure. Oguejiofo does not dispute the numerous instances of missed deadlines, departures from protocol, and unprofessional behavior. And second, while not dispositive, three other employees within the same reporting structure as Oguejiofo who were not African-American received the same rating as Oguejiofo during the 2012-13 review period. The Bank offered non-pretextual reasons for the reviews, and Oguejiofo cannot rebut them simply because he disagrees. *See Swider v. Ha-Lo Indus., Inc.* 134 F. Supp. 2d 607, 628 (D.N.J. 2001).

(3) Termination

Oguejiofo's final disparate treatment claim is that he was terminated due to his race or national origin similarly fails. Yet again, he points to nothing even suggesting that this was the reason for his termination.[10]

Moreover, Oguejiofo does not allege that the Director who made the decision to terminate him harbored any discriminatory animus. Instead, he focuses his claims of discrimination on two supervisors who gave him a negative performance review and reassigned him. He ignores the fact that the Director made the decision to terminate him

---

[10] Oguejiofo claims a Director told him that two of his supervisors "were planning to get [him] fired." A-696. The Director disputes this fact. Even granting all reasonable inferences to Oguejiofo, this claim in itself does not suggest that his supervisors were planning to get him fired on account of his race or national origin.

without input from these two allegedly discriminatory supervisors. And finally, as with the previous claims, the Bank had a legitimate, non-discriminatory explanation for his termination. Oguejiofo repeatedly missed deadlines and clashed with co-workers.

In brief, Oguejiofo's claims for disparate treatment all fail for the same reason: nothing in the record so much as hints at unlawful discrimination, and the Bank had legitimate non-discriminatory reasons for each of its actions.

*B. Hostile Work Environment*

In addition to his disparate treatment allegations, Oguejiofo also asserts that he was subjected to a hostile work environment in violation of his federal and state civil rights.[11] Oguejiofo claims that he was subjected to "yelling, intimidation, mistreatment, reassignment, negative performance reviews, and criticism." Appellant's Br. at 27.

The District Court rejected this contention, finding that Oguejiofo "failed to show that Defendants' conduct was tied to his race." A-19. We agree. As with his disparate

---

[11] Hostile work environment claims under Title VII and NJLAD are analyzed under the same general framework. *See Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001); *White v. Cleary*, 2012 WL 924338, at \*6 (D.N.J. Mar. 19, 2012).

To state such a claim under federal law, Oguejiofo must show that (1) he suffered intentional discrimination because of his race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior liability. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

To state such a claim under NJLAD, a plaintiff "must demonstrate that the defendant's conduct (1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [person of the same protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Taylor v. Metzger*, 706 A.2d 685, 688–89 (N.J. 1998).

treatment claim, Oguejiofo offered no reason to believe that his treatment was linked to his race or national origin. Indeed, he "concede[s] the absence of direct remarks to him about his race or national origin." Appellant's Br. at 27.

While Oguejiofo created a list "of incidents" where his superior "rebuked" him, A-402, these incidents at most constitute mistreatment, with no tangible connection to race or national origin. Indeed, Oguejiofo himself links the deterioration of his relationship with his supervisors to a disagreement about strategy on a project, rather than his race or national origin. As such, the District Court properly granted summary judgment in Defendants' favor.

*C. Aiding and Abetting*

Finally, Oguejiofo states that the District Court erred in granting summary judgment in favor of two of his supervisors on his the aiding and abetting claims. NJLAD provides for claims against individual employees who "aid, abet, incite, compel or coerce" any acts forbidden under the statute. N.J. Stat. Ann. § 10:5-12(e); *Tarr v. Ciasulli*, 853 A.2d 921, 928 (N.J. 2004). The District Court properly found that the claims for aiding and abetting fail because "there is no underlying wrongful act" which the accused aided and abetted.[12] A-21.

---

[12] Oguejiofo obliquely argues that the District Court "failed to properly assess Appellant's claim that Appellees' withheld pertinent emails." Appellant's Br. at 19, 25. Apparently, these emails would have provided evidence of discrimination. Oguejiofo failed to develop this argument in his brief beyond mentioning it in the summary of his argument, and in support of his argument as to the Bank's real motivations for terminating Oguejiofo. He has directed us to nothing in the record to evaluate this claim, to the extent he makes one, and thus waived any claim he had regarding discovery. *See*

## II. Conclusion

Because Oguejiofo presented no evidence allowing any inference of unlawful discrimination, even granting all reasonable inferences in his favor, his claims fail. We will affirm the ruling of the District Court.

---

*Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 416 (3d Cir. 2016) ("A 'passing reference to an issue . . . will not suffice to bring that issue before this court.'" (quoting *Laborer's Int'l Union of N. Am. v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (alteration in original)); *id.* at 417 ("If a claim of error is 'unaccompanied by developed argument,' it is forfeited." (quoting *Rodriguez v. Mun. of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011)).